WILLIE A. BRIMER, Administratrix of the Estate of STEPHEN BRIMER, deceased, Respondent, v. JAMES C. DAVIS, Director General, as Agent Designated under the Transportation Act of 1920, in Charge of Litigation on Causes of Action Arising During and Out of Federal Control of the Chicago & Alton Railroad Company, Appellant.

St. Louis Court of Appeals.  Opinion Filed November 7, 1922.

1. RAILROADS: Interstate Commerce: Federal Employers' Liability Act: Evidence: Engine Being Prepared to Leave Yards to Haul Interstate Train: Devoted to Interstate Commerce.  In an action to recover damages for death prosecuted by the administratrix of deceased under the Federal Employers' Liability Act, evidence *held* to sustain the view that the engine upon which deceased had been working was devoted to interstate commerce in that it was being prepared to take out a train of cars some of which were loaded with interstate freight.

2. ———: ———: ———: ———: Employee Preparing Engine to Haul Interstate Train: Engaged in Interstate Commerce.  In an action to recover damages for death prosecuted by the administratrix of deceased under the Federal Employers' Liability Act, where deceased, a railroad yard man, was engaged in the work of preparing an engine, devoted to interstate commerce, to leave the rail-

road yards, and while still engaged in these duties and in the act of completing them he was summoned by his foreman, and while attempting to reach the foreman was struck and killed by another engine which was backing in, *held* the evidence supports the conclusion that at the time of the casualty, deceased was engaged in interstate commerce or in the performance of an act so directly and immediately connected therewith as to form practically and substantially a part thereof.·

3. ———: ———: ———: ———: Death of Employee: Deceased Engaged in Interstate Commerce: Question for the Jury. In an action for damages for the death of a railroad yard man killed by an engine which was backing in, after leaving an engine upon which he had been working in response to his foreman, the question of whether or not deceased was at the time of the casualty, engaged in interstate commerce was a question submitted to the jury, and *held* the evidence warranted such submission.

4. NEGLIGENCE: Federal Employers' Liability Act: Contributory Negligence: Not Bar to Recovery: Damages: Diminished. In an action for damages for death under the Federal Employers' Liability Act, the negligence of the deceased is not a bar to recovery but goes only to diminish the amount of the damages recoverable.

5. RAILROADS: Negligence: Backing Engine: Duty to Give Warning Signals. In an action for damages for death of a railroad yard man killed in a railroad yard by an engine backing in, though a primary duty rested upon the deceased to take precautions for his own safety in passing over a track, this did not absolve the operators of the engine of all duty with respect to giving warning of the approach thereof.

6. ———: ———: ———: Death of Railroad Yard Employee: Failure to Give Warning: Evidence: Question for the Jury. In an action for damages for death of a railroad yard man killed in a railroad yard by an engine backing in, evidence *held* to show a violation of the duty imposed upon the operators of such engine to give timely warning of its approach so as to take the case to the jury.

7. MASTER AND SERVANT: Federal Employers' Liability Act: Negligence: Determined by Principles of Common Law. The Federal Employers' Liability Act does not undertake to define negligence, and what is negligence thereunder is a matter to be determined by application of the principles of the common law.

8. COURTS: Federal and State Courts: Federal Employers'. Liability Act: Defining Common Law Negligence: Conflict: Rule of Decision. While state courts are given jurisdiction in cases arising under

Brimer v. Davis.

the Federal Employers' Liability Act, should there be .any lack of harmony as between the rule of decision in the courts of the State and that prevailing in the Federal courts as to what constitutes negligence at common law, the federal rule necessarily controls.

9. ———: ———: ———: Assumption of Risk: Federal Rule Applies in State Court. Likewise in an action for damages in the state court for death under the Federal Employers' Liability Act the Federal rule as to assumption of risk applies.

10. NEGLIGENCE: Federal Employers' Liability Act: Assumption of Risk: Evidence: Question for the Jury. In an action for damages under the Federal Employers' Liability Act for the death of an employee killed in a railroad yard by being struck by an engine backing in, held under the evidence that the deceased did not assume the risk of such injury as a matter of law.

11. INSTRUCTIONS: Permitting Recovery Upon Finding of Matters Upon Which Liability May not be Predicated Under Evidence: Erroneous. In an action for damages for death of an employee killed in a railroad yard by an engine backing in, an instruction in the alternative, predicating a recovery (1) upon the driving of the engine by the operators thereof "at a high and unusual rate of speed without giving any warning of its approach" or (2) the driving of said engine by the operators thereof "at a high and unusual rate of speed without having said engine under control," held erroneous in permitting a recovery upon a finding alone of matters upon which liability may not be predicated under the facts disclosed by the evidence.

12. NEGLIGENCE: Injury and Charge: Causal Connection: May be Shown From Circumstances. It is axiomatic that a causal connection must be established between the loss or injury suffered and the negligence charged: it is not necessary, however, that such causal connection be shown by direct and positive testimony; it is sufficient if made to appear by reasonable and legitimate inference from facts and circumstances shown in evidence.

13. RAILROADS: Death of Employee: Negligence: Excessive Speed of Engine: Evidence: Insufficient to Establish Causal Connection Between Excessive Speed and Death. In an action for damages under the Federal Employers' Liability Act to recover for the death of an employee killed in a railroad yard by an engine backing in, evidence held insufficient to establish a causal connection between excessive speed of the engine striking deceased and his death.

14. ———: ———: ———: Engine not Under Control: Evidence Insufficient to Predicate Liability. In an action for damages under

the Federal Employers' Liability Act to recover for the death of an employee in a railroad yard killed by an engine backing in, evidence *held* insufficient to afford any ground for submitting to the jury, as a predicate of liability, the alleged failure of the operators of the engine to have it under control.

15. **APPELLATE PRACTICE**: Instructions: Prejudicial Error. In an action to recover damages for death, prosecuted by the administratrix of deceased under the Federal Employers' Liability Act, the giving of an instruction in the alternative, which allowed a recovery upon the finding alone of facts upon which liability may not be predicated, under the evidence *held* error materially affecting the merits of the action and the substantial rights of appellant.

Appeal from the Circuit Court of Pike County.—*Hon. Edgar B. Woolfolk,* Judge.

REVERSED AND REMANDED.

*McGinnis & Smith* and *Charles M. Miller,* for appellant.

(1)   The trial court erred in refusing appellant's peremptory instructions for two reasons: (a) Plaintiff's alleged cause of action was predicated on the federal Employers Liability Act, and the evidence showed that deceased Brimer was not, at the time of the accident, engaged in interstate commerce. Winters v. Railroad, 242 U. S. 353; Van Buskirk v. Railroad, 228 Fed. 489; Chicago, Burlington & Quincy Railroad v. Harrington, 241 U. S. 177; Cronin v. Railroad, 176 Pac. 919; Ind. Comm. v. Railroad, 123 N. E. 278; Mayers v. Railroad, 100 Atl. 967; Nary v. Railroad, 159 N. W. 230.  (b)   No actionable negligence proven against defendant. Gabal v. Frisco Railroad, 251 Mo. 257-267; Cahill v. Railroad, 205 Mo. 393; Degonia v. Railroad, 224 Mo. 564; Evans v. Railroad, 178 Mo. 517; Sissell v. Railroad, 214 Mo. 515; Kelly v. Railroad, 75 Mo. 142; Fore v. Chicago & Alton Railroad, 114 Mo. App. 551-555.  (2)   The trial court erred in giving plaintiff Instruction 1 for the reason that it assumed that the defendant

211 M. A.—4

was guilty of negligence and was further erroneous in not stating to the jury what would constitute negligence. (3) The trial court erred in refusing defendant's instructions 9, 10, 13 and 14, relating to alleged negligent rate of speed and alleged failure to give warning for the reason that said instructions properly declared the law applicable to this case. (4) The trial court erred in refusing defendant's instructions 11 and 12 for the reason that they properly declared the law. (5) The trial court erred in refusing defendant's instruction 17, to the effect that deceased Brimer was not engaged in interstate commerce at the time of the accident.

*Hostetter & Haley,* and *Frank Hollingsworth,* for respondent.

ALLEN, P. J.—This is an action to recover damages for the death of Stephen Brimer, alleged to have been caused by the negligence of the original defendants, Walker D. Hines, Director General, and the Chicago & Alton Railroad Company. The action is prosecuted by the administratrix of the estate of said Stephen Brimer, deceased, under the Federal Employers' Liability Act. The trial below, before the court and a jury, resulted in a verdict and judgment in favor of plaintiff and against the defendant Walker D. Hines, Director General, in the sum of $6250. From this judgment said defendant prosecuted an appeal to this court, and pending the appeal James C. Davis, agent designated under the Federal Transportation Act of 1920, has been substituted as defendant and appellant in lieu of said Walker D. Hines.

Stephen Brimer was in the employ of Walker D. Hines, Director General—whom we shall term the defendant—during Federal control of the Chicago & Alton Railroad Company, at Booth, a freight division point on said railroad in the State of Missouri, in the capacity of "supply man." Defendant maintained at this place yards with many tracks, and north of those tracks a distance of, perhaps, more than two hundred feet were

the two tracks with which we are here concerned. These two tracks began at a turntable located at the entrance to defendant's roundhouse, and, after diverging as they left the turntable, extended almost due west, being apparently a little less than thirty feet apart. The north track was known as the outbound track, and was used for engines and trains proceeding west out of Booth. The south track was known as the inbound track, and engines came in on it, proceeding east, to enter the roundhouse. West of the roundhouse, perhaps five hundred or six hundred feet, was a coal chute, or coaling station, a tall structure upon timbers or "trestle work," situated between the outbound and the inbound tracks mentioned above. A short distance east of this coal chute, and on the south side of and near the south or inbound track, was a sand house. Between this sand house and the turntable was a cinder pit located beneath the south or inbound track; and a short distance southeast of this cinder pit was a small house or shanty referred to in the evidence as the fire knockers house or the rest house. North of the north or outbound track, and somewhere between the coal chute and the round-house, was a small tool house.

Plaintiff had been working with one Offutt, the engine hostler, engaged, together with Offutt, in preparing an engine, engine No. 842, which was shortly to leave Booth to take a train west from that point. It was Brimer's duty to furnish the engine with coal, water, oil, sand, etc., and assist the hostler in getting the engine ready. It appears that this work had been practically completed on engine No. 842, though it is said to have been the duty of Offutt and Brimer to take the engine, when completely ready, to a point on the outbound track opposite the tool house mentioned, where the road engineer usually took charge of it. While this engine, No. 842, was standing on the north or outbound track facing west, with the front end thereof perhaps a short distance east of the east end of the coal chute, Brimer left it in response, it is said, to a beckoning signal by the yard

foreman, one Smith, who was standing east and somewhat south of Brimer, south of the two tracks mentioned, at a point about southeast of the cinder pit and near the fire knockers house. Brimer walked toward the foreman, proceeding, for the most part, approximately southeast or south of east, until he reached the inbound track at a point a short distance west of the cinder pit. As he was stepping upon the inbound track he was struck and killed by an engine, engine No. 429, which was proceeding east on that track, "backing in," i. e. with the engine facing west and backing east, with the tender preceding it.

The assignments of negligence in the petition are: (1) An assignment that the foreman was negligent in beckoning to plaintiff under the circumstances. (2) That defendant's agents and servants in charge of the engine which struck and killed the deceased were negligent in driving it at a high and unusual rate of speed without giving any warning of it approach; and (3) that said agents and servants in charge of said engine were negligent in driving it at a high and unusual rate of speed without having the engine under control and without having "some person on the lookout so that said engine could have been stopped whenever necessary to protect employees crossing over or going along said tracks."

At the beginning of the trial the following stipulation of counsel was introduced in evidence, viz.:

"In order to avoid the taking of depositions, it is hereby stipulated and agreed by and between the attorneys of record herein as follows:

"First. That a freight train was pulled from Booth, Missouri, to Slater, Missouri, on July 21, 1918, by engine No. 842 and that there was in some of the cars of said train on said date, between said Booth and Slater, merchandise which had been shipped in said cars from points in other States of the United States to Booth in the State of Missouri and destined for other points in Missouri, and also merchandise in some of the cars of said train shipped from points in the State of Missouri to other points within the State of Missouri.

"Second. That engine No. 842 had pulled over the tracks of the Chicago & Alton Railroad previous to being placed in the roundhouse at Booth, Missouri, on July 21, 1918, cars engaged in both interstate and intrastate commerce.

"Third. That the Chicago & Alton Railroad is and was on July 21, 1918, engaged in interstate and intrastate commerce and is a railroad doing both interstate and intrastate commerce, having lines of railroad in the State of Illinois and connecting with lines of railroad in the State of Missouri.

"Fourth. That the engine which on July 21, 1918, ran over and injured Stephen Brimer was either a switch engine which had previously been engaged in assembling cars in interstate and intrastate commerce or was a road engine which had previously been engaged in pulling cars engaged in interstate or intrastate commerce.

"Fifth. That Booth is a freight division point on the Chicago & Alton Railroad."

Offutt, the engine hostler mentioned above, testified, in substance, that he and the deceased had just completed preparing engine No. 842 to go out on the road— though it was their duty to take the engine east to the tool house mentioned where it was taken charge of by the engineer—when the foreman beckoned or motioned to them with his hand indicating that he desired one or both of them to come to him; that about that time the witness noticed that the top of the sand dome of the engine was off, and he began to put that in place while Brimer started toward the foreman who, as said, was standing a short distance southeast of the cinder pit across the two tracks from the witness and the deceased. The witness said that he saw engine No. 429 backing in towards the cinder pit, first noticing it when it passed the coal chute; that the deceased crossed the north or outbound track and continued, proceeding nearly east but slightly south of east, toward the foreman, while engine No. 429 continued to back east on the inbound track; that seeing Brimer approaching or about to step

upon the inbound track, with engine No. 429 approaching him from the rear, the witness called to him three times in an effort to attract his attention and warn him of the danger, but that the latter apparently did not hear the warning, stepped upon the track and was struck by the tender of the engine. The witness testified that in his judgment engine No. 429 was traveling about five miles per hour, the engineer being on the north side of the engine, his accustomed place, and the fireman on the south side thereof; that a man was on the rear footboard of the tender, on the south end of that footboard when the engine passed the coal chute—but he heard no warning given by this man. He further testified that the distance which Brimer traveled, in going from engine No. 842 to the point on the inbound track where he was struck by engine No. 429, was in his judgment about fifty or sixty feet; that Brimer was "in the manner of stepping over" the north rail of that track—had perhaps put one foot over the rail when he was struck; that the accident happened between eleven and twelve o'clock in the forenoon.

On direct examination of this witness the following occurred: "Q. I will get you to state whether or not that engine (No. 429) gave any signals? A. I never heard them. Q. Well, did it whistle or ring a bell as you heard? A. No, sir." The witness further testified that engine No. 842 and engine No. 429 were both road engines; that engine No. 842 "was a west-bound engine called for to go out on the west end of the road," and that it pulled a train out that morning a few minutes after the casualty occurred.

On cross-examination this witness said that the inbound track was a "live track;" that it was as much used as any track in the yards; that an engine moved over it practically every hour, and sometimes many in an hour. He said that in his judgment his engine, No. 842, was about thirty feet east of the coal chute when Brimer left it, and that Brimer was struck about twenty-five feet east of the sand house.

One Inlow, an employee of defendant, testified that he was standing near the "number three track switch" in the yards, almost due south of the point where Brimer was struck and perhaps three hundred or four hundred feet therefrom; that he noticed engine No. 429 when it was perhaps ten or fifteen feet, "maybe not that far," from Brimer, and "noticed it looked like he was about to be struck;" that it appeared that Brimer's back was toward the engine, and that he was "walking right from the engine," which was "backing up." This witness said that he noticed that a brakeman, one Meyers, "was just jumping across the draw bar from the north to the south side of the engine." And he said: "Well, he (Meyers) got on the north side of the engine and it looked to me like he was trying to shove Mr. Brimer off the track best he could, but he wasn't successful." Later, the witness said he saw Meyers, "as he jumped across from the south side of the engine to the north side." He said that he did not know that there was any special rule as to where a brakeman should be "when he comes in there," but that he usually rode on the engineer's side and that that was "generally the proper place for a brakeman to communicate signals to the engineer." On cross-examination he said that he saw Brimer when the engine was possibly eight or ten feet from him, and that it would not take the engine more than "a second or two" to traverse that distance; that he was not sure whether he "was on the inside of the rail or just on the outside;" that this inbound track was a live track, likely to have an engine on it at any time, but that no trains passed over it; that it was used for taking the engines to the cinder pit and roundhouse.

On redirect-examination the witness was asked whether engine No. 429 gave any signal by way of ringing the bell or sounding the whistle, and he answered: "Well, I couldn't say as to the signal, I wasn't paying any attention to anything like that, I wouldn't notice it if they did whistle or ring the bell, I wouldn't have noticed it at all, being used to such as that you know, I

never paid any attention to it, I couldn't say whether it did or didn't, not knowing.''

William Bell, an employee at these yards, testified that he was standing in front of the fire knockers house at the time when Brimer was struck. His testimony is to the effect that the prescribed and ordinary rate for moving engines over this inbound track was five miles per hour. After examination of the witness by plaintiff's counsel at some length, during which a number of objections to his testimony were sustained, he was permitted to testify that in his judgment engine No. 429 was running about ten miles per hour when it struck Brimer. He corroborated the testimony of Offutt that the foreman, Smith, beckoned with his hand to Brimer as related by Offutt. And he said that he did not hear any signals given by engine No. 429 ''such as the sounding of a whistle or ringing of the bell.'' On cross-examination he placed the speed of the engine at nine or ten miles per hour. He also testified on cross-examination that he saw Brimer walk down the track several steps before he was struck; that the foreman Smith called his attention to Brimer's perilous position, and that Smith called to Brimer to get off the track, Smith being then about one hundred fifty feet from Brimer.

One Cox testified that he was standing at the east end of the cinder pit near foreman Smith when the latter said, ''Going to be a man killed;'' and that as he looked up the engine struck Brimer. When asked if the engine gave any signals by way of ringing the bell or sounding the whistle, he said: ''I didn't see any or hear any.'' On cross-examination he said that the engine was backing at the rate of about six miles per hour, in his judgment; that the inbound track was a very busy track. On redirect examination he said that his duties required him to cross this track many times, and that Brimer was required to cross it many times in the performance of his duties.

It is unnecessary to refer to the testimony of the plaintiff, Mrs. Brimer, except to say that her testimony

is that Brimer was forty-three years of age, and that his hearing and eyesight were good.

In behalf of the defendant, the fireman of engine No. 429, one Clark, testified, on direct-examination, that as the engine backed in on the inbound track he was seated on the south side thereof with his hand upon the bell cord, and that he rang the bell from about the time the engine passed the west end of the coal chute until it struck Brimer; that the engine was traveling from five to eight miles an hour, this being about the usual speed. On cross-examination he said that he was positive that he was ringing the bell, but could not remember when he commenced ringing it; that he always rang the bell; that he was looking east but did not see Brimer, who was on the north side of the inbound track. He said that he knew the employees working about the yards cross and recross this inbound track in the performance of their duties, this being "the regular custom." His further testimony in this connection is as follows:

"What do you pull the bell cord for? A. Well, to give warning to anybody who should happen to be around; let them know we are coming. Q. You knew that there were persons employed there who had to cross and recross the tracks? A. Yes, sir. Q. In the performance of their duties? A. Yes, sir. Q. Well, what were you looking east for then? A. That's the direction we were going. Q. What was the occasion of your looking at all? A. Well, I don't know, only to be on the lookout, that is my duty."

He said that he heard the engineer whistle and saw him apply the air, but did not know whether the air was applied before or after Brimer was struck.

One Meyers, the brakeman on engine No. 429, testified that after throwing the switch at the west end of the yards to let engine No. 429 in on the inbound track, he got on the footboard at the rear of the tender, being the forward end as the engine and tender backed in; that as the engine passed the coal chute it was traveling, in his judgment, about five or six miles an hour, "possibly

six and one-half or maybe five and one-half;'' that a rule of the yard required engines to come in at not over six miles per hour; that he first saw Brimer when the latter was about half way between the outbound and inbound tracks, at which time the engine was at the east end of the coal chute and the witness was on the north end of the running board. From his testimony, which is somewhat contradictory and indefinite, it appears that he crossed from the north end of the running board to the south end thereof as the engine approached the cinder pit. Referring to Brimer, the witness, on direct-examination, said: ''He had been walking across in a southeasterly direction and about that time he strikes within about four or three, possibly three and one-half or four feet of the inbound track and walked a couple of steps along there and then stepped a few feet over onto the end of the ties, and when he did that I seen that we were going to hit him, and we were so near to him it was absolutely impossible to warn him to get out of the way, and I yelled at him and if he had heard me he couldn't have gotten out of the way then because we were too close to him, and there is an iron bar that runs along the framework of the tender called a 'grab iron' and I had hold of that grab iron with one hand trying to strike him with my fist to knock him off the track . . . but I couldn't reach him, and we struck him and run over him.''

On cross-examination he was asked if he did not know that employees crossed and recrossed this track in the performance of their duties, and he replied in the affirmative. He denied that it was a rule for some one to ride on the back of an engine or tender backing in, to prevent accidents. He said, in substance, that he did not give a stop signal; that from the south end of the running board a signal by him would not be seen by the engineer; but the fireman could see it and tell the engineer to stop. He stated that the tender extended about eighteen inches or two feet over the rails on each side of the track; that Brimer ''hadn't gotten inside the rail;'' that when Brimer stepped on the edge of the

ties his back was directly towards the witness and was looking east; and that the witness was within six or eight feet of Brimer when he called to him.

On redirect-examination this witness testified that when he first saw Brimer the latter was eight or ten feet from him, and when he next saw him Brimer was within three or four feet of the track; that Brimer then "stepped over on the edge of the ties," the tender being then five or six feet from him. However, on recross-examination he said that he saw Brimer before the engine got to the east end of the coal chute.

The engineer of engine No. 429, one Temple, testified that he saw Brimer as his engine got at the east end of the coal chute, at which time Brimer was twenty or possibly thirty feet north of the inbound track, "going toward the south in between the tracks;" that Brimer was, he thought, four or five feet from the rear end of the tender when he stepped on the track; that the witness had hold of the brake valve and applied the brakes, stopping the engine in about eighteen feet. When asked if he started to stop the engine when he saw Brimer going over towards the track, he said: "No, sir, because he was in clearance distance when I saw him." Being asked what would be the clearance distance, he said: "Well, he was four feet, that is in two feet of good clearance." He testified that the engine was moving at about five miles per hour; that he whistled when Brimer was eight or ten feet from the inbound tracks, and when he saw Brimer step on the track he applied the brakes.

On cross-examination he said that his engine might have been going five and one-half or six miles an hour as he came in; that Brimer was "walking along leisurely —was walking a little southeast, more east than south;" that when he first saw Brimer the latter was about fifteen or twenty feet from him, and that he at once sounded the whistle. He said that the bell was ringing. Testifying further on cross-examination he said that he applied the air brakes as soon as he saw Brimer start over on the track. A portion of his testimony in this connec-

tion is as follows: "Q. You had seen Mr. Brimer before you got to the east end of the coal chute. A. Yes, sir. Q. And you immediately applied the brakes? A. Yes, sir. Q. Put on the air? A. No, sir. Q. When did you put on the air? A. Put the air on when I struck him, the air was applied— Q. You didn't apply the air until after you struck him? A. The emergency not until I struck but when I saw him step over on the track. Q. So that you struck him before you put on the emergency? A. Yes, sir, it was as soon as I saw him step over on the track, about four or five feet from the engine when it hit him." Later he said: "When I saw him step over on the track is when I applied the brakes or emergency." Subsequently he testified: "Q. Then you made no effort to stop until the very moment you struck him or was in the act of striking him? A. The man was in clearance distance when I got in five feet of him, and when he walked to the track he turned down the track for a few. steps and then he stepped over on the track, sideways on the track." When asked again what he meant by clearance distance, he said: "Where I could have passed him in safety if he continued to walk there—three feet or more from the track."

Smith, the foreman, testified that he did not signal or beckon to Brimer to come to him; that he saw Brimer walking in front of engine No. 429 and tried unsuccessfully to warn him by calling and motioning to him. On cross-examination he said that he first saw Brimer about the time the latter stepped on the inbound track. He said that Brimer, in the performance of his duties, was required to cross and recross this inbound track, as were some of the other employees. Thereupon he was asked: "And that, of course, was known to the engineers and the firemen and all the railroad brakemen or all of them that come in there, they knew that this was a busy yard and quite a number of employees there, and that the men would necessarily have to pass over the track in performance of their duties, didn't they?" And he answered: "Yes, sir." He said that the rule or regulation as to

the rate of speed in coming in on this inbound track, running backwards, was that engineers were ''supposed to run their engines under control'' and at a speed of five miles per hour.

## I.

The first insistence of appellant is that the trial court erred in refusing to peremptorily direct a verdict for the defendant at the close ·of plaintiff's case and again at the close of the entire case. This insistence proceeds, first, upon the ground that the evidence showed that the deceased was not, at the time of the casualty, engaged in interstate commerce and that the case, therefore, cannot be maintained under the Federal Employers' Liability Act. The argument advanced is ιthat the evidence conclusively shows that Brimer had completed his work on engine No. 842 when he left that engine, and that consequently, if his work in connection therewith was interstate in character, it had ceased prior to the time of the casualty; and that further there was no showing that, at the time engine No. 842 was being prepared, it was known it would be used in interstate commerce.

Referring first to the second branch of appellant's argument, we may say that we regard it as entirely clear that the evidence, together with the stipulation, supra, amply sustains the view that engine No. 842 was devoted to interstate commerce, in that it was being prepared to take out a train of cars some of which were loaded with interstate freight; and that consequently Brimer, while actually engaged in the work of preparing this engine to leave the yards, was engaged in interstate commerce. [See North Carolina Railroad Co. v. Zachary, 232 U. S. 248; N. Y. Central, etc. Railroad Co. v. Carr, 238 U. S. 260.] And as to the argument that Brimer's work upon this engine was completed, and that he was not, therefore, engaged in interstate commerce when injured, it may be observed that the evidence is that it was the duty of Offutt and Brimer to take the engine to a point opposite the tool house, which had not been done. It thus

appears that their duties in connection with the engine were not entirely completed when Brimer left it in response, it is said, to his foreman's signal. His duties of an interstate character required him to be on the north side of these tracks. He was still engaged in these duties, if plaintiff's evidence is to be believed—was in the act of completing them, when summoned, and was struck and killed while coming from Engine No. 842 and attempting to reach his foreman. We think that the evidence supports the conclusion that at the time of the casualty he was engaged in interstate commerce or in the performance of an act so directly and immediately connected therewith as to form practically and substantially a part thereof. [See N. Y. Central, etc. Railroad Co. v. Carr, supra.] We do not hold that, as a matter of law, the deceased was engaged in interstate commerce. The question was submitted to the jury by plaintiff's instructions, and we think that the evidence warranted such submission. [See North Carolina Railroad Co. v. Zachary, supra.]

## II.

It is insisted, however, by appellant's learned counsel that no negligence on the part of or attributable to the defendant was shown, and that therefore the court erred in refusing to peremptorily direct a verdict for it. In support of this insistence it is argued that the case is governed by the rulings of our Supreme Court in Gabal v. Railroad Co., 251 Mo. 257, 158 S. W. 12; Cahill v. Railroad, 205 Mo. 393, 103 S. W. 532; Degonia v. Railroad, 224 Mo. 564, 123 S. W. 807; Sissel v. Railroad, 214 Mo. 515, 113 S. W. 1104; and Evans v. Railroad, 178 Mo. 517, 77 S. W. 515.

In the Gabal case, upon which defendant strongly relies, the plaintiff, a car repairer, who with another was attempting to move a drawhead along a track by means of a small freight truck, was struck by moving cars and injured. It was held that he was guilty of negligence as a matter of law; that the duty is imposed upon em-

ployees such as switchman and section men about railroad yards to take precautions for their own safety as against the approach of engines and cars; and that this imposed duty ''licenses the belief upon the part of the operator of the engine that such an employee, although in a place of danger, will upon the approach of the cars, step to one side and avert the danger.'' And the court said: ''In such cases the humanitarian rule cannot be invoked upon the mere seeing of the man in a dangerous position, but can only be invoked from the time that the operator of the engine sees that the man is not going to protect himself, as is usually done in such cases, by taking a step or two to one side.''

But we think that the case before us has features differentiating it from the Gabal case and likewise from the other cases upon which appellant relies. The action is one under the Federal Employers' Liability Act, and under that Act the negligence of the deceasd is not a bar to recovery but goes only to diminish the amount of the damages recoverable. The case is not one involving injury to a section man or other like employee engaged in working upon a track. Nor is the humanitarian doctrine involved. We think that the evidence showing that the deceased and other employees were required, in the performance of their duties, to repeatedly pass back and forth over this inbound track, and that this was fully known to the operators of engines using the track to reach the cinder pit or roundhouse, warrants the conclusion that under the conditions prevailing thereabout the operator of engine No. 429 did not have the right to expect a clear track at that point; but that in backing the engine in on this track it was their duty to give timely warning of its approach; that though a primary duty rested upon the deceased to take precautions for his own safety in passing over this track, this did not absolve the operator of the engine of all duty with respect to giving warning of the approach thereof. This view, we think, is supported by the recent decision of the Supreme Court in Greenwell v. Railway Co., 224 S. W. 404. [See,

also, Kippenbrock v. Railroad, 270 Mo. 489, 194 S. W. 50; Tetweiler v. Railroad, 242 Mo. 178, 145 S. W. 780; Ostertag v. Railroad, 261 Mo. 457, 169 S. W. 1; Hardwick v. Railroad, 181 Mo. App. 156, 168 S. W. 328; Walker v. Railroad, 193 Mo. App. 249, 183 S. W. 636.] In Tetweiler v. Railroad, supra, it is said:

"The defendant had peculiar duties growing out of its relation to its employees, none of which were more important than that which required it to use reasonable care to furnish them a safe place to work, and in no situation is the performance of this duty more important than in an active railroad yard, where they are constantly menaced by the death-dealing appliances of the master. This necessity was expressed by the Supreme Court of Nebraska in Union Pacific Ry. Co. v. Elliott, 54 Neb. 299, 305, as follows: 'Irrespective of any statute on the subject, the starting or running of a switch engine, in a switch yard filled with a net work of tracks upon which cars and engines are constantly moving and in which yardmen are constantly at work, without the ringing of a bell or the blowing of a whistle, is evidence of negligence.' "

But if there be doubt as to whether, under the decisions of our own courts, the evidence here tended to show a violation of a duty imposed upon the operators of engine No. 429 to give timely warning of its approach, so as to take the case to the jury, ample authority for such holding, we think, may be found in the rulings of the Federal Courts. [See Erie Railroad Co. v. Purucker, 244 U. S. 320; Norfolk & Western Ry. Co. v. Earnest, 229 U. S. 114; Southern Ry. Co. v. Smith, 205 Fed. 360; 123 C. C. A. 488; Norfolk, etc., Ry. Co. v. Holbrook, 215 Fed. 687; 131 C. C. A. 621; Southern Ry. Co. v. White, 232 Fed. 144; Hughes v. Delaware L. & W. R. Co., 233 Fed. 118; Delaware L. & W. R. Co. v. Hughes, 240 Fed. 941; Frazier v. Interstate R. Co., 264 Fed. 96.]

In Southern Railway Co. v. Smith, supra, which has been cited approvingly in a number of cases, the action was one under the Federal Employers' Liability Act

for the death of a switch tender who was run upon and killed by a switch engine in railway yards. The evidence tended to show that the deceased stepped upon the track eighty or one hundred feet in front of the engine, and walked along the track, with his back to the engine, while the latter ran a distance of one hundred feet at a very slow speed; and that the engineer, who could have stopped his engine in ten feet, was not keeping a lookout and did not give a warning. The court said:

"We cannot say that there was no duty whatever to keep a lookout for Smith. Doubtless, it was primarily Smith's duty to keep out of the way, but this did not absolve the engine crew from all obligation. The care required and the duty imposed with reference to the yard employees seen upon the tracks are much less in degree than with reference to strangers; but defendant's theory of no duty would extend to a case where an employee was obviously helpless on the track and might have been seen for some time from the coming engine. It would permit the engine crew to run through the yard with their eyes shut, and it is too broad. Under such facts as here exist, there must be a concurrent or secondary duty, independent of statute or rule, to keep such lookout as is reasonably necessary to avoid injury to the employee who may neglect his primary duty to protect himself. [McMarshall v. Railway, 80 Iowa, 757, 761, 45 N. W. 1065, 20 Am. St. Rep. 445; Schlereth v. Railway, 115 Mo. 87, 21 S. W. 1110; Railroad v. Craft (C. C. A. 9), 69 Fed. 124, 128, 16 C. C. A. 175.]"

It may be noted also that in the Smith case it is pointed out that the facts therein involved differ essentially from those involved in Aerkfetz v. Humphreys, 145 U. S. 418, cited and quoted from in the Gabal case, supra, upon which appellant herein relies.

The Employers' Liability Act, under which this case is brought, gives a right of action for "injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such car-

211 M. A.—5

rier,'' etc. The Act does not undertake to define negligence, and what is negligence thereunder is a matter to be determined by application of the principles of the common law. While state courts are given jurisdiction in cases arising under the Act, should there be any lack of harmony as between the rule of decision in the courts of a State and that prevailing in the Federal Courts as to what constitutes negligence at common law, the Federal rule necessarily controls. [See Richey, Federal Employers' Liability Act, p. 120.]

It is argued, however, that there is no substantial evidence that the bell was not ringing. It is true that there is abundant testimony for defendant that the bell was ringing and that the whistle was sounded. But the evidence in plaintiff's behalf, as we have detailed it at length above, unquestionably tended to show that no warning was given, and constituted substantial evidence to take that question to the jury.

In appellant's reply brief the point is made, for the first time, that the deceased assumed the risk of such injury, as a matter of law, and hence no recovery may be had herein. The question was not timely raised in this court; but we may say that we regard it as without merit. It is true that the Federal rule as to assumption of risk applies (Prior v. Williams, 254 U. S. 43); but we are convinced that under that rule it cannot be held, as a conclusion of law, that the deceased assumed all risk of injury by this moving engine. [See Erie Railroad Co. v. Purucker, supra.]

We are therefore of the opinion that the court did not err in refusing to peremptorily direct a verdict for appellant.

### III.

Complaint is made of instruction No. 1, given at plaintiff's request, which is as follows:

"The court instructs the jury that if you find and believe from the evidence in the cause that the plaintiff, Willie A. Brimer, is the acting and qualified adminstra-

trix of the estate of Stephen Brimer, deceased, and if you further find that on the 21st day of July, 1918, the defendants were engaged in interstate commerce between the State of Missouri and any other State by railroad, and further that at said time the said Stephen Brimer was in the employ of the defendants in such commerce, and if you further find that while so engaged as an employee in such commerce, the said Stephen Brimer was run into and killed by defendant's engine No. 429, and if you further find that such collision and consequent death of said Stephen Brimer was the result of the negligence on the part of any of the officers, agents or employees of defendants in either of the following instances, viz.: In that the agents and servants of defendant in charge of engine 429 were, just before and at the time of the collision, carelessly driving said engine along and over said track, where such collision took place, at a high and unusual rate of speed without giving any warning of its approach; or that the agents and servants in charge of engine 429 were, just before and at the time of such collision negligently driving said engine along and over the track where such collision took place at a high and unusual rate of speed without having said engine under control; and if you further find from the evidence that said Stephen Brimer left surviving him a widow, and four minor children; and if you further find from the evidence that said widow and four minor children were dependent upon said Stephen Brimer for support and maintenance, then you will find the issues in favor of the plaintiff.''

One attack upon this instruction is that it assumes that defendant was negligent, and tells the jury that if they find that Brimer's death was the result of such negligence, then to find for plaintiff. The instruction, indeed, is unfortunately worded in this respect, in that it requires the jury to find that Brimer's death resulted from ''the negligence'' of the defendant's agents and employees in doing or failing to do certain acts, appearing then to assume that such acts or omissions constituted negligence as a matter of law. The instruction should

Brimer v. Davis.

require the jury to find acts or omissions upon which liability may be predicated, and that the same constituted negligence.

But if there be room for argument that the instruction, as worded, would be understood by a jury of laymen as requiring them to find negligence on the part of defendant's agents and servants in charge of engine No. 429—which we need not decide—the instruction, we think, is fatally erroneous in permitting a recovery upon a finding alone of matters upon which liability may not be predicated under the facts disclosed by this record; this being a ground of objection raised against the instruction by appellant. It will be observed that the instruction is in the alternative, predicating a recovery (1) upon the driving of engine No. 429, by the operators thereof, "at a high and unusual rate of speed without giving any warning of its approach," *or* (2) the driving of said engine, by the operators thereof, "at a high and unusual rate of speed without having said engine under control." Because of the questions involved on the demurrer to the evidence and in connection with this instruction we have set out the evidence, supra, in great detail. Though the evidence for the most part tends to show that engine No. 429 was proceeding at the prescribed and usual rate of speed, there is some evidence that it was exceeding that rate. However, it is axiomatic that a causal connection must be established between the loss or injury suffered and the negligence charged. The fact that this engine was run at a rate of speed beyond that prescribed by rule and custom, if true, raised no presumption that Brimer's death was caused thereby; but on the contrary it devolved upon plaintiff to establish a causal connection between the two. It was incumbent upon plaintiff to adduce some evidence tending to show that the injury and death would not have occurred had the engine been running at the prescribed and usual rate of speed. [See Battles v. Railways Co., 178 Mo. App. 596, l. c. 614, 615, and authorities cited, 161 S. W. 614.] It is not necessary, however, that such causal connection be shown by

direct and positive testimony; it is sufficient if it be made to appear by reasonable and legitimate inference from facts and circumstances shown in evidence. [See Schmidt v. Transit Co., 140 Mo. App. 182, 120 S. W. 96; Stotler v. Railroad, 200 Mo. 107, 98 S. W. 509; Battles v. Railways Co., Supra.]

A careful review of the evidence has convinced us that there is nothing in the case which, by inference or otherwise, tends to establish a causal connection between the excessive speed, if any, and Brimer's death. The evidence most favorable to plaintiff as to the speed of the engine places it at not to exceed ten miles per hour. The only definite testimony touching the matter makes it appear that Brimer stepped upon the track, or into the danger zone, but a short distance in front of the engine, and it appears without dispute that he was struck just as he reached the first rail of the track or as he was stepping over that rail. He was walking slowly, and after getting on the track, or in the path of the tender and engine, he proceeded, it is said, nearly eastwardly. If the engine was exceeding the prescribed and usual rate of speed, there is nothing from which it may be inferred that had it been proceeding at such prescribed and usual rate Brimer would have crossed the track in safety. Nor does the evidence otherwise suggest that his death proximately resulted from the running of the engine at a rate of speed exceeding, by a few miles per hour, the prescribed and usual rate.

Nor, under the evidence, do we perceive any ground for submitting to the jury, as a predicate of liability, the alleged failure of the operators of engine No. 429 to have it under control. The engineer testified that he had used the brakes to slow down as he came by the coal chute; that he had "hold of the brake valve;" and that he applied the air as soon as he saw Brimer going into the danger zone. There is no evidence that the engine was not "under control," unless it can be said that the evidence as to excessive speed tends to so show; but there is no evidence as to the distance in which the engine

could have been stopped had it been proceeding at the prescribed and usual rate. All that appears in that connection is that the engine was stopped in about eighteen feet.

It will be seen that this instruction is so framed as to allow a recovery as for excessive speed and failure to have the engine under control, even though the jury should find in favor of defendant on the controverted issue of fact as to whether a warning was given or find that such failure, if any, did not constitute negligence. This, we think, constituted prejudicial error. Such error cannot be regarded as harmless. In our view of the case defendant can be held liable, under the evidence in the record, only upon a finding of the facts necessary to a verdict in her favor under the assignment of negligence in the petition relating to failure to warn; upon which issue the evidence is conflicting. We are therefore compelled to hold that the giving of this instruction was error materially affecting the merits of the action, (Sec. 1513, R. S. 1919) and the substantial rights of the appellant (Sec. 1276, R. S. 1919).

It is unnecessary to consider other questions discussed in the briefs. For the error noted the judgment must be reversed and the cause remanded. It is so ordered. *Becker* and *Daues, JJ.*, concur.