**Paul JAMES, Appellant,**

v.

**SUNSHINE BISCUITS, INC., and V. W. Staley, Respondents.**

**No. 51328.**

Supreme Court of Missouri, Division No. 1.

April 11, 1966.

Motion for Rehearing or for Transfer to Court En Banc Denied May 9, 1966.

Thaine Q. Blumer, Blumer & Wright, Kansas City, for plaintiff-appellant.

Lyman Field, Rogers, Field & Gentry, Kansas City, for respondents.

HIGGINS, Commissioner.

In this wrongful death action plaintiff had a verdict and judgment for $20,000. The court overruled defendants' motion for new trial but sustained their motion to set aside verdict and judgment and entered judgment for defendants.

On July 18, 1962, plaintiff's wife, Virginia June James, was employed by defendant Sunshine Biscuits, Inc. at Sunshine's plant in Kansas City, Kansas. The plant produced crackers, cookies, and candy. De-

fendant V. W. Staley was the superintendent and ranking employee on the night shift. There were no nurses or physicians present on the night shift and the first-aid room was locked at night. Staley carried a key to the first-aid room and he was experienced in caring for injured and ailing employees. Sunshine's policy was to have him call the company physician for severe illness or injuries and to try to get sick employees to their families or family physicians. He also could give temporary relief by medicines kept in the first-aid room. He would average one or two emergencies a month requiring him to call a hospital and send an employee there due to the plant physician being unavailable. Sick employees were to be relieved at their work and permitted to obtain a physician of their choice.

At about 3 P.M., July 18, 1962, Mrs. James and some coworkers arrived at work from Richmond, Missouri. Mrs. James was in good spirits, was not complaining of any illness, and appeared normal and in good health. She was not under medical care and her last medical treatment was for a sunburn.

At 7 P.M. the plant shut down for the 35-minute lunch period and Mrs. James went outside the plant and purchased a ham and cheese sandwich and some potato salad from a Rainbow Catering Company [1] truck. Later she became ill and left her place at work on the production line, and at 7:20 the following morning she died. Since the issue is whether there was substantial evidence that delayed medical care caused the death, we detail the evidence relating to the illness, treatment, hospitalization, and death.

Betty Sue Roberts, one of decedent's coworkers from Richmond, Missouri, saw Mrs. James at the first break after the lunch period. Someone advised her that Mrs. James was sick and she went to the lounge to see about her. "There was probably eight, ten girls in there. * * * When I walked in, she was vomiting. * * She was standing with the (toilet) door open, and she had this green stuff coming out of her mouth." Neither she nor the others assisted her from the toilet. "I asked her if she wanted to go home, and she said she thought she would be all right in a few minutes." She left the lounge and went to the cafeteria to join her friends for the remainder of the 15-minute break. After the break she returned to her machine. "It hadn't run very long at all until they came and told me I was wanted in the back." She hunted up Van (Mr. Staley) and he told her, "Go in there and keep that girl quiet." She could not fix the time of the break or how long after the break she returned to the lounge. Upon her return Myra Hazen and Charles Lanning were present. "He was trying to keep her quiet." She assisted him in getting water for Mrs. James and "we got cardboard and put under her head." Staley came in carrying some Kaopectate and she, Lanning, and Hazen administered it to Mrs. James. Lanning shut off the vent because Mrs. James was cold and Staley got some cloth candy covers to put over her. "All the time we were in there, June was hollering for help." Staley asked her if she knew any doctors and she replied that she did not. "Mr. Lanning wanted to take Mrs. James to the hospital, which was about ten or fifteen minute's drive from there and Van didn't want him to. * * * he just kept saying he was handling it." She said that about 10 o'clock, "She (Mrs. James) was screaming for a doctor. * * * she begged him (Staley) for a doctor, too." Of Mrs. James's condition at this time, she said, "She had been vomiting. She was wet with perspiration * * *. Her clothes were just soaked with everything. I mean she was—had diarrhea, vomiting, and there was sweat.

---

1. V. D. Elder and Geraldine Elder, doing business as Rainbow Catering Company, were also sued in this action. They were charged with failure to warn deceased that said foodstuffs were dangerous to human consumption, and during the trial they settled with plaintiff for $5,000.

\* \* \* Everything was a mess in there, and it smelled horrible." When she got off work at 11 P.M., Dr. Flanders was attending Mrs. James and she was taken by ambulance to the hospital. Mrs. Roberts rode in the ambulance with the patient.

Charles Lanning was an electrician on the night shift at Sunshine. At about 9 P.M. he became informed that a lady was sick in the ladies' lounge and, upon approaching the lounge, "I heard this lady moaning and sick and hollering for a doctor. \* \* \* she had vomit all over the front part of her dress, and she had diarrhea which was evidenced all over the place, and she had perspiration on her uniform. \* \* she told me that she was unearthly sick." He asked one of the girls to call Van Staley and he came to the lounge. They talked about getting the lady to a doctor and the witness said, "I told him I would take her up to Bethany Hospital. \* \* \* The only thing that he done, and that was a little bit later than that, he went back to the First Aid Room and came back with a bottle of this Kaopectate. \* \* \* It seems to me it was around 10:00 o'clock. \* \* \* About 10:00 o'clock, he said that he would call a doctor." When informed that it would be about one hour before the doctor arrived, the witness said he offered to take the lady to the hospital in his car. The doctor (Dr. Flanders) arrived around 11 P.M. He took over, talked to Mrs. James, and did not send her to the hospital immediately. An ambulance was called "between 11:30 and quarter of twelve," and it arrived at 12 o'clock. The witness was present when Betty Roberts arrived around 9:30 and at the discussion concerning calling Mrs. James's family.

The ambulance driver, Glenn Pittser, described Mrs. James as a sick woman when he picked her up. She was in charge of Dr. Flanders and she was delivered at St. Lukes Hospital in Kansas City, Missouri, about 12:10 or 12:15 on the morning of July 19th.

Miriam Good was also one of the group who rode to Sunshine from Richmond, Missouri. According to her, Mrs. James got sick and left the line a little after 8 o'clock. She was gone not over five minutes, worked for about ten minutes more, got sick, and left again. She next saw Mrs. James in the lounge around 9:30 at the break time. "She was sick. \* \* \* I just knew she was sick, and she was pale looking, and I—I just didn't pay any attention to her clothes." Around 11:30 at quitting time she saw Mrs. James again. She was lying down on the couch and her appearance was "awful." Dr. Flanders, Mr. Staley, Betty Sue Roberts, and others were present.

Patricia Lee Good, another of the group from Richmond, saw Mrs. James at the 9:30 break. "She was in the restroom. \* \* she was back vomiting, and she was awfully sick." She next saw Mrs. James at 11:30 on the couch in the lounge. Dr. Flanders was present. "She was begging someone to get her a doctor and get her out of there, and she wanted someone to call her husband." According to her, Mrs. James looked different at 11:30 from her appearance at 9:30.

Admissions of defendant Staley were that he was talking to Myra Hazen about 8:15 P.M. and Mrs. James asked Mrs. Hazen to relieve her. His next notice of Mrs. James was about 9 o'clock when Mrs. Hazen informed him that Mrs. James was sick and needed something for an upset stomach. He saw Mrs. James in the lounge about 9:15 and Mr. Lanning appeared within five minutes. "We both tried to get her to take some Kaopectate. \* \* \* I think it was a little later than that she asked about the doctor. It was after 9:30 or about 9:30 when the girls started going back off their break, and at least Mr. Lanning and Miss Roberts and myself stood outdoors—I mean right out the door there and talked about it, and I asked at that time who their family doctor was so we could try, you know, to get hold of him."

He also testified that when neither Mr. James, Mrs. Roberts, nor Mr. Lanning knew

of a local doctor, he decided between 9:45 and 9:50 to call the company doctor, Dr. Flanders. (Dr. Flanders died before the trial.) The doctor called him back in five to ten minutes, at which time he advised the doctor that Mrs. James "was a pretty sick woman, and that she complained of having stomach cramps and had begun to vomit at that time, and that I really wanted information on what to do." He also told the doctor of the involuntary bowel movements and urination that Mrs. James was experiencing. He was advised to continue with the Kaopectate until the doctor could get there and that he would come right over. Staley did not consent to move Mrs. James because he had put the matter into the doctor's hands. Dr. Flanders arrived at 11 o'clock and "started to giving her some more medication, sitting down beside her and talking to her, and trying to—giving her an examination or find out what was wrong with her. * * * He turned around to me right at 11:30 and asked me to take him to a phone where he could call the hospital and an ambulance."

Myra Hazen stated that she was the steward in the night shift icing department. She saw nothing wrong with Mrs. James at the 7 o'clock supper break. She next saw Mrs. James when she relieved her at 9 o'clock. She came back after five or ten minutes, stayed a short time, and left again. During the break from 9:30 to 9:45 she observed Mrs. James "to be quite ill at that time, had been vomiting and also diarrhea." She got word to Staley after that, around 10 o'clock, and they tried to give her the Kaopectate.

Clara Pickett saw Mrs. James leave the line. "She said she had a burbling in her stomach, and she said she felt ill, and then all of a sudden, she had to leave. She came right back. * * * I never did see her vomit." She saw Mrs. James again at the 9:30 break and "she didn't look too bad. She never looked like she was really bad sick. * * * they had cleaned her up, but you could still smell the odor."

Medical evidence consisted of the St. Luke's Hospital record and the testimony of Waldo S. Holt, M.D.

Dr. Holt first saw Mrs. James upon her arrival at St. Luke's Hospital about 12:00 or 12:15 on July 19, 1962. "I carried out as complete an examination as I could, at the time, and it was certainly apparent that she was in extreme pain and what I would call a moribund condition, very critically ill at that time, and blood pressure was either unobtainable or very, very low. It was in shock level when I first saw her, first obtained it. * * * she was covered with feces and vomitus from her head to her foot. She reeked * * *. It was apparent that she was dehydrated, because she had poor skin tone. She had obvious dryness of the mucuous membranes, and * * * was complaining bitterly about having extreme pain * * *. It was difficult to get her to localize it * * *. The first thing was to try to get her out of shock and institute measures to bring the blood pressure up * * *." Dr. Holt stayed with her until around 4:30 A.M. when her blood pressure "came up to around 110 over 70, which is a more respectable reading * * *."

The doctor obtained some history from Mrs. James when she first came into the hospital at which time she vomited some, "and I saw some cherries (which she ate from the chocolate covered cherry line at the plant) that was in the vomitus, and she was having bowel movements all the time; but in between all that, she was telling me the best she could, and then there was also someone (Mrs. Roberts) who was with her who was filling in some details, who apparently had gone down to the vending wagon with her or something like that, and gotten some food." His impression upon Mrs. James's hospital admission was: "Severe food poisoning due to ? potato salad etc.—shock—dehydration—condition poor." The hospital record shows: "5:00 Resting off and on * * * 6:00 Bed changed, and sponge bath given. * * * Pt. (patient) alert—asked to have 02 (oxygen) removed. 7:10 Pt. suddenly gasped.

Turned cyanotic. 7:15 Dr. Theis & Holt notified Dr. Theis here. Adrenalin * * * given. * * * Unable to obtain B. P. Artificial resp. appled by Drs. Theis & Peterson. Adrenalin 1 c.c. given in heart muscle. Dr. Holt here. Resuscitator applied. Unable to obtain pulse. Resp. ceased. 7:35 Dr. Holt pronounced pt's. demise."

An autopsy was performed of which Dr. Holt said: "We could actually not find an anatomical cause of death, * * * and I think only from inference or by deduction can we say what she finally died of, but there was no anatomical cause of death."

The testimony of Dr. Holt in respect to cause of death is quoted in additional detail and context:

"Q (Mr. Blumer) All right. What was your opinion as to the cause of death?

"MR. FIELD: Now, just a minute, I object to that, or preliminary to objection, I want to ask the Doctor a question. If I understood you, Doctor—you correct me if I am wrong—you said you could not give any diagnosis or medical opinion, you could only give a speculation or a * * * Did I understand you that you would be unable to give a medical opinion as to the cause of her death, and that anything that you would respond to in that connection would be a speculation or an educated guess or something like that? Is that right?

"THE WITNESS: Well, I would say that it would be—really, a logical deduction would be about the only thing we could make from the circumstances. I still cannot give you an anatomical cause of death, or I can't really tell you why she died. MR. FIELD: You would have a medical opinion on it? MR. BLUMER: Well, he said he did have a—MR. FIELD: Wait just a minute, I want to complete my interrogation before I make an objection. I mean you couldn't give a medical opinion and your medical opinion as to what the cause of death was? THE WITNESS: Nothing based on what was actually found at the autopsy, but if you ask me what I thought

had caused her death—MR. FIELD: You mean your impression? THE WITNESS: That's right, my impression would be that she had acute food poisoning. MR. FIELD: Yes, but you couldn't—that wouldn't reach the dignity of a diagnosis or a medical opinion, would it, because there just weren't enough facts? THE WITNESS: It's not scientifically proven, no. * * *

"Q (Mr. Blumer) Let's see. I am back to the question, then. What is your opinion, Doctor, as to the cause of her death? A The only thing that I can say on that is just based upon the facts as I know them, the most likely thing is she had acute food poisoning, the exact etiology of which was undetermined. By that, I mean we never could prove an organism such as Salmonella or Shigella or anything like that that might have caused her death.

"Q Now, you also said you found her suffering from shock and dehydration? A Yes, sir. Q Would you have an opinion as to the effect of shock and dehydration upon her general condition leading to her death? A Well, it certainly isn't unusual when people come in in shock with blood pressure unobtainable that they do not get well, because they're just too far gone.

"Q Well, let me ask you this, then, Doctor: Would you have an opinion as to whether or not the shock and dehydration contributed or was a cause in her death? A Oh, I would say so, definitely. I mean she had lost so much fluid, both from the rectum as well as by the mouth, that she was in shock, and she was dehydrated. She had lost a lot of chemicals that the body needs and needs to be replaced if we're going to live.

"Q Now, Doctor, what did you say caused dehydration and shock? A The loss of all this fluid and chemicals. I mean when we vomit, we're vomiting sodium and chloride and potassium. When we move our bowels and have diarrhea, these profuse bowel movements reduce the important chemicals, potassium, sodium and chlorides

the body needs. That's why she was in shock, and that's why we were trying to replace them."

Plaintiff asked two hypothetical questions relating to delay as the cause of death, and sought answer only to the second in the following context:

(1) "Q Doctor, let me ask you this: Assume certain facts. Would you assume that Mrs. James became ill first somewhere around 8:00 or even as late as 9:00 p. m. on July 18, 1962, and that within thirty minutes, or around 9:30 p. m. of that same day, that she was vomiting and having bowel movements, and that she was then weak, and that she was then asking for a physician, and assume further that she did not have any medical care until—other than the giving of some Kaopectate to her on one or two occasions during the about two hour or two and a half hour period up until approximately 11:00 o'clock, would you have an opinion as to whether or not her failure to receive medical or hospital care within that period of time contributed to the shock or dehydration which you diagnosed her suffering from? * * *

"MR. FIELD: Preliminary to objection. I beg your pardon, Your Honor; preliminary to objection. Would your answer have to be based in part, to that question, on speculation and guesswork? THE WITNESS: Well, it certainly would to a degree. MR. FIELD: Yes, sir, I thought so. I object to the question for that reason, Your Honor."

(2) "Q (Mr. Blumer) But let me ask you this, Doctor: I am talking about whether or not, in your opinion, based upon those facts, assuming that those are the facts, whether or not in your opinion this lady, as you saw her, the failure to have medical care from 9:30 until 11:00 o'clock could have contributed to her shock and dehydration which you found her suffering from after midnight on the same day? A Well, I am sure that's true. Q Well, so your answer would—A If I understand you correctly. I mean that yes, it was detri-

mental that she didn't have medical care sooner, because look at the end result."

Immediate cross-examination produced the following testimony:

"Q (Mr. Field) Right on that point, Doctor, isn't it a fact that all things considered, that as Mr. Blumer has given to you, and taking the very assumptions he asked you to assume, that she became suddenly ill about 8:30 or perhaps as late as 9:00 o'clock, and that over that span of time, you saw her three hours later, just about 12:00—A Uh-huh. Q (continuing) —you couldn't, as a physician and an internist, have any medical opinion that had she been brought in an hour earlier, or even two hours earlier, or even when she first had her severe seizure at 9:00, as he asked you to assume, the vomiting and bowel movements, you can't have any—you couldn't have a medical opinion that you could have saved her life, even if she had been brought in three hours earlier, could you? A I cannot say she would have lived if she was brought in earlier, no. Q So though you like to think that you could have reduced the shock or somewhat held the shock down, and like to think that you could have saved her life—A That's right. Q (continuing)—had she been brought in earlier—A That's right. Q (continuing) —you can't say on the facts, on the basis of reliable medical opinion, that even if she had been brought in after 9:00 o'clock, when she first had this violent seizure and the vomiting he asked you to assume, and involuntary bowel movement, you can't say that you would have been able to have saved her life, even as a probability, can you? A No, I can't say that. Q And you would simply have to speculate on that, wouldn't you? A That's right.

"Q So if she was delayed in getting medical attention by an hour or two hours, you could not have any medical opinion that that delay caused her death or contributed to cause it, could you? A Well, I think on the surface of it, a delay like that is not good. Q Certainly. A I think

this is apparent. Q You would like to think you could have saved her? A That's right, but I can't say this without a doubt. Q You can't say any delay—A No, I can't say.

"Q You can't say that any delay actually cause it or contributed to cause her death, can you? A Well, as I say, it is certainly reasonable, I think, to assume that as you said, if we had gotten her sooner—Q You like to think—A (continuing)—I like to think we might have been able to do it, but this doesn't really prove or establish that if we had seen her a half hour after she became sick that she would be here now or would have survived. Q And any belief or statement that you might have been able to save her would have to be based on some speculation and guesswork, wouldn't it? A That's right. * * * Q Now, what I am leading up to is this, Doctor, this thing apparently went so very fast. The onset, as I think the language doctors use, the onset was sudden, wouldn't you say that was true? A Uh-huh, that's right. Q Then can you say, without resorting to some speculation and guesswork, can you say that this type of undetermined etiology, sudden onset, went so very fast, can you say without speculating or guesswork that had she been brought in sooner after her seizure that you would have saved her life or could have—even could have saved her life? A No, you can't say that any more than you can say to a patient, 'I will guarantee to you a perfect result if you have this surgery.' You can't do those kinds of things in medicine. Q And you couldn't even say that you could have saved her life, you can't even go so far as, except by speculation, some speculation and guesswork, to say that you even could have saved her life, isn't that right? A I think that's right. I think the assumption is usually made that if we are ill, that the sooner we get help, the better our chances are. I think this is—Q Right. A (continuing) —something that is logical assumption.

"Q Right, but when you get down to assessing—when you get down to assessing

the delay in getting help on the facts of this case, the sudden seizure, you can't give any medical opinion or have any opinion, unless it is based in part on speculation and guesswork, that delay after her seizure caused or contributed to cause her death, can you? A I cannot say that she would have been alive had I seen her earlier. * * *

"Q And further, it has been testified to here that Dr. Flanders arrived at 11:00 o'clock at the plant, and that instead of calling the ambulance immediately, that Dr. Flanders instead talked with her, attempted to talk with her, asked her what she had eaten, tried to get her to take some Kaopectate, observed her, and within a matter of a half an hour, having had her under observation, called the ambulance and had an ambulance come and take her to the hospital. Now you are not saying that that half hour delay at that time contributed to cause her death, as a medical opinion, are you? A I really can't answer that. Q Of course not. You couldn't have an opinion on it, could you, without speculation? A No, I really couldn't."

Redirect and recross-examination produced the following further testimony respecting cause of death:

"Q (Mr. Blumer) Well, Doctor, with regard to this question of immediate or near immediate care for a person in distress or ill, is it your testimony that this is or is not important or significant in their care and possible recovery, the immediate or near immediate care for someone in distress or sickness? A Well, I think it is an important thing, and I think we can say in retrospect it was very important, because the patient did not live. * * *

"Q (Mr. Field): Doctor, just this last question. Does this fairly sum it up, that in this case, on the facts of this case, that from a medical and scientific view, it is really impossible to determine whether or not, had you been able to see her earlier, you could or might have been able to save her life, it is impossible to so determine, because there are too many factors that are

not known that would have to enter into such a decision, if you were to be scientific and have a medical opinion on it, isn't that correct? A Yes. As I said, she was undoubtedly very gravely ill. Q Yes, sir. A If she wasn't, she would not have succumbed, I am sure of this, and yet I cannot say if I had seen her three hours earlier she would have survived, because it is obvious she was very, very ill. Q Yes, sir. A But as you had said, we like to think that if we see them earlier, we can help them. Q Certainly. A But that doesn't prove that she would still be alive or that we could have helped her. The end result might have been the same.

"Q And so the reverse side, then, any delay in getting to her, getting her to you, after 9:00 o'clock, after the seizures came on, any delay, you cannot say with any definiteness or with the stature of a medical opinion, that that directly caused or directly contributed to cause her death, can you? A I cannot say that. I think any delay, when someone is this ill—Q It would help to get them there? A It would help to get them there, certainly.

"Q And this is unlike the case, for example, where somebody had had their jugular vein severed, or an artery severed, a main artery, and you could get them right away, you could then say, and have a medical opinion based on reasonable medical probability, that had you got them there when the artery was severed, and clamped it, that you could have saved her life, isn't that right? A Yes, it would be different from that. Q And there is a great distinction between that and this type of case, isn't there? A Yes, sir.

"Q And it is for that reason that you find it impossible to have any scientific and medical opinion on that subject, isn't that right? A It is impossible for me to prove that caused her death."

The autopsy report showed as final diagnosis: "Primary: Acute gastroenterocolitis. Generalized visceral congestion. Pulmonary edema."

Plaintiff's theory of recovery against these defendants was that they were negligent under the law of Kansas in knowing of the illness of their employee, who had become ill while at work and unable to obtain medical assistance for herself, and thereafter failing to obtain prompt medical attention for such employee. Haggard v. Lowden, 156 Kan. 522, 134 P.2d 676, 679[6]. See also Hunicke v. Meramec Quarry Co., 262 Mo. 560, 172 S.W. 43, L.R.A.1915C, 789; 35 Am.Jur., Master and Servant, § 109; 64 A.L.R.2d 1146. And the sole question here is whether plaintiff produced any substantial evidence to prove that the death of plaintiff's decedent was caused by delayed medical attention.

Appellant contends, of course, that there is substantial evidence that defendants' actions were the proximate cause of the death of Virginia June James and, in presenting his case on causation, he suggests and follows a classification of the cases dealing with the necessity for expert testimony.

His first classification is of those cases in which no expert is necessary on the issue of causation because common knowledge relates cause and effect as in the case of stomach pain and illness following immediately upon the consumption of soup containing broken glass. Bell v. S. S. Kresge Co., Mo.App., 129 S.W.2d 932, 935 [4–6]. Next is his grouping of those cases where expert testimony of scientific possibility combined with other evidence fulfills the requirement of substantial evidence as where there are facts which tend to show that an accident caused a certain condition and the expert then supports that evidence by testifying that the accident might, could, or would produce the condition in issue. See Ketcham v. Thomas, Mo., 283 S.W.2d 642, 649[9, 10], where a uterine bleeding condition worsened following the impact of collision. Finally, he recognizes the cases in which no lay person would be expected to know the cause, such as where injury is claimed to be the cause of a coronary occlusion. In this classification an expert is necessary and he must be reasonably certain

or no substantial evidence is offered on the issue of causation. Schaefer v. Rechter, Mo., 290 S.W.2d 118, 123[2, 3]; Brown v. Metropolitan Life Ins. Co., 236 Mo.App. 315, 151 S.W. 499, 503[6].

Appellant reminds that causal connection need not be shown by direct and positive testimony, as it is sufficient if it be made to appear by reasonable and legitimate inferences from facts and circumstances shown in the evidence, Brimer v. Davis, 211 Mo.App. 47, 245 S.W. 404, 412[13]; Dyer v. W. M. Sutherland Building & Contracting Co., Mo.App., 258 S.W. 48, 50[3]; Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 253 S.W.2d 158, 161[3]; that plaintiff's evidence need not exclude all causes for which defendant would not be liable in order to recover, as it is sufficient if there is substantial evidence from which the jury may find that negligence was the proximate cause, anything beyond that being a matter of defense, Swanson v. Godwin, Mo., 327 S.W.2d 903, 910[5]; that causal connection must be proved, but direct proof of the connection is not required, it being sufficient that facts proved are of such nature and so connected and related that the conclusion of causal connection may be fairly inferred, Watt v. St. Louis Public Service Co., Mo., 354 S.W.2d 889, 891[2]; Taylor v. Hitt, Mo.App., 342 S.W. 2d 489, 495[10, 11].

Appellant says that the facts and circumstances of this case are such that no medical opinion is necessary on the issue of proximate cause because common knowledge would permit the jury to find that defendants' actions caused the death of plaintiff's decedent. He argues that by common sense reasonable persons could know that food poisoning does not usually cause death; that a person in Mrs. James's condition is in need of, and likely to be helped by, immediate medical assistance; that after three hours' care she showed improvement; and that it is therefore not necessary to have a physician testify that delayed medical care caused the death. Cases cited by appellant in support of this contention are not in point because they involved situations in which the injury or illness and the consequences were obvious. For example, in Wyckoff v. Davis, Mo., 297 S.W.2d 490, deceased fell from a horse and was rendered unconscious. While being rushed to a hospital, the vehicle in which he was riding was struck by defendant causing it to turn over several times. He was dead a few minutes later and a fractured skull with brain tissue showing and an evulsed eye were obvious conditions not present prior to the collision. Expert testimony was obviously not necessary on the issue of causation. In Fellows v. Farmer, Mo.App., 379 S.W.2d 842, deceased was found dead in defendant's automobile which had hurtled through space and crashed into a concrete wall. He suffered a crushed head and it was obviously unnecessary to have an expert say that the injury was sustained in the accident and that it caused the death. In Hunicke v. Meramec Quarry Co., supra, deceased was run over by a railroad car. His leg was "frightfully crushed" below the hip and "great quantities of blood were freely flowing." The employer delayed some four to five hours in securing medical care and the employee died from obvious delay in stopping loss of blood.

In contrast, this case, as Dr. Holt stated, does not involve an obvious causal connection, certainly not as between delayed medical care and death. No anatomical cause of death was shown and no cause was readily apparent. Under our authorities, then, it would be improper to permit the jury to infer death due to delayed medical care without the aid of expert testimony, because no layman could know or have any reasonable basis for such inference. Bertram v. Wunning, Mo.App., 385 S.W.2d 803, 806–807[2, 3]; Gulley v. Spinnichia, Mo.App., 341 S.W.2d 301, 305[4]; Kimmie v. Terminal R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, 564 [3–5]; Moore v. Glasgow, Mo.App., 366 S.W.2d 475, 483[9, 10]; Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312, 316[8];

Cox v. Missouri-Kansas-Texas R. Co., 335 Mo. 1226, 76 S.W.2d 411, 415–416[4, 5].

Since proximate cause in this case cannot be shown without the aid of medical testimony, we turn to appellant's contentions that the medical testimony alone amounts to substantial evidence that delayed care caused the death, and that the medical testimony, when assisted by other evidence, amounts to substantial evidence on the issue of causation.

Appellant bases the first of these contentions on an analysis of the medical evidence to the effect "that Mrs. James suffered from acute food poisoning, complicated by shock and dehydration, and that she died because of circulatory failure caused by shock"; and he refers to the opinion of Dr. Holt that shock and dehydration caused or contributed to cause Mrs. James's death and the doctor's response to the only answered hypothetical question that "it was detrimental that she didn't have medical care sooner."

Appellant supports this contention with Pijut v. St. Louis Public Service Co., Mo., 330 S.W.2d 747, where there was testimony that the nephritis plaintiff had in his body for years *could have been caused* to flare up as a result of the accident, and that the particular flare-up *was caused* by the accident. The case is not in point on appellant's problem here, however, because there causation was present when "Plaintiff showed with reasonable certainty that the death was caused by an acute attack of nephritis precipitated and caused by traumatic shock. Dr. Klein positively so testified four times." 330 S.W.2d 1. c. 751 [1]. Appellant argues that the "inconsistencies and some indefiniteness of the testimony of Dr. Holt" was not complete erosion or impeachment and that it was substantial evidence upon which to submit the case. The cases cited in support of this argument are also not in point on his problem because the medical testimony in each was obviously sufficient to take the issue of causation to the jury. In Green

v. Terminal R. Ass'n of St. Louis, Mo.App., 135 S.W.2d 652, Dr. Hurd stated in his opinion the trauma sustained in the collision *was* the producing or procuring cause of plaintiff's diabetic condition and the cross-examination was not a repudiation of the witness's opinion. In Walker v. St. Louis Public Service Co., 362 Mo. 648, 243 S.W.2d 92, 96[2], "The statement of Dr. Stubbs that 'I feel that it (the accident) has probably speeded up the course of her development of congestive heart failure' in connection with his whole testimony, amounted to an expert opinion that the aggravation did hasten the development of congestive heart failure." And in Breland v. Gulf, Mobile & Ohio R. Co., Mo., 325 S.W.2d 9, despite weaknesses, inconsistencies and incongruities in plaintiff's medical evidence which were for the jury to weigh, it was obvious that when defendant's engine derailed plaintiff was caused to sustain trauma violent enough to render him unconscious, fracture a vertebra, and develop a hematoma, all of which resulted in pain, loss of time, hospitalization, loss of weight and strength.

In this case it is apparent from the facts previously detailed that plaintiff failed to produce substantial medical evidence that delayed medical care caused or contributed to cause the death. Dr. Holt and the autopsy were unable to make a final diagnosis of cause of death and no anatomical cause was shown. He had only an impression, which he admitted would not reach the dignity of an opinion, that the deceased had acute food poisoning. He found the patient suffering from shock and dehydration which contributed to or caused the death, but only by indulging in guesswork and speculation could he have an opinion that failure to have medical care for "about (a) two hour or two and a half hour period up until approximately 11:00 o'clock, contributed to the shock and dehydration." In similar vein, he acknowledged that the mentioned delay "could have contributed to her shock and dehydration" but qualified his acknowledgment by saying "it was detri-

mental that she didn't have medical care sooner, because look at the end result." Dr. Holt would not say that her life could have been saved even as a probability had he seen her earlier, saying only that he would "like to think" that he could have reduced the shock or saved her life if he had treated her sooner. The doctor also acknowledged that the sudden onset of the patient's illness rendered him unable to have an opinion without guesswork and speculation that delay after the seizure caused or contributed to cause the death. Thus, it appears that the most Dr. Holt's testimony aids plaintiff is that the shock and dehydration contributed to or caused the death of his wife, but the doctor was unable to relate such shock and dehydration to any delay in securing medical care without resorting to guesswork and speculation. Even though he acknowledged that delayed care *could* have contributed to shock and dehydration, Dr. Holt denied even a probability of saving the patient's life had he seen her sooner. So it is that this case is within the ambit of those in which possibilities secured from testimony to the effect that a certain condition might, could, or would be caused by the negligence charged is not of itself substantial evidence upon which to submit the issue of causation to the jury. That is to say that absent substantial evidence from Dr. Holt that delayed medical care did cause the death of Mrs. James, his opinion that delayed medical care could have contributed to her shock and dehydration or that he would like to think he could have saved her, standing alone, did not make a submissible case because the jury could solve the issue of causation on such testimony only by guesswork. Kimmie v. Terminal Ry. Ass'n of St. Louis, supra, 66 S.W. 2d, 1. c. 565[6–11]; Stewart v. Martin, 353 Mo. 1, 181 S.W.2d 657, 658[3, 4]; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 646[2, 3]; Hunt v. Armour & Co., supra, 136 S.W.2d 1. c. 316[8]; Fritz v. Manufacturers R. Co., Mo.App., 124 S.W.2d 603, 607[6]; Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999, 1006–1007[5]: Walker v. St. Louis Public Service

Co., supra, 243 S.W.2d 1. c. 97–98[3–5]; Bertram v. Wunning, supra, 385 S.W.2d 1. c. 806–807[2–6]; Moore v. Glasgow, supra, 366 S.W.2d 1. c. 483[9, 10]. See also Raftery v. Kansas City Gas Co., 237 Mo.App. 427, 169 S.W.2d 105, 109[3, 4]; Kinealy v. Southwestern Bell Telephone Co., Mo., 368 S.W.2d 400, 404[4].

This leaves remaining appellant's contention that the medical evidence, when assisted by other evidence in the case, amounts to substantial evidence on the issue of causation.

In the hypothetical question put to Dr. Holt, plaintiff selected the period 9:30 until 11 o'clock as the interval of the superintendent's "failure to have medical care" for Mrs. James. From the testimony previously detailed, it appears that defendant Staley called Dr. Flanders no later than 10 o'clock, and plaintiff's case was submitted on the hypothesis that "defendant Staley failed or refused to use reasonable care to seek and obtain medical or hospital care on behalf of Virginia June James within a reasonable time following his knowledge, if any, of her immediate need for medical or hospital care." The lay witnesses described the circumstances giving rise to Staley's knowledge. Witness Roberts left Mrs. James near the end of the "break" and joined other friends in the cafeteria. She had no concern at that time. Mrs. James had said she would be all right. Mr. Lanning saw Mrs. James around 9 o'clock, had Staley called, and Staley arrived in "30 to 45 minutes." Staley called Dr. Flanders by 10 o'clock. Miriam Good saw Mrs. James at the break as she finished vomiting and she was pale looking. Patricia Good saw Mrs. James at "9:30 on our break." She was vomiting into the toilet. The witness thought Mrs. James had the flu and she was not apprehensive about the situation when she left at the end of the break at 9:45 o'clock. Myra Hazen saw Mrs. James at the 9:30 break when she appeared to be quite ill. Clara Pickett did not think Mrs. James looked "too bad" when she saw her at the break. Defendant Staley called Dr. Virgil Flanders

around 9:45 to 9:50 and Dr. Horace Flanders called back about 10 o'clock. He directed Staley to give the patient more Kaopectate and said he would come right over to the plant. Mrs. James was not ill before eating and became ill only after eating a sandwich and potato salad around 7 o'clock.

The burden was on plaintiff to prove the cause of death and that the cause was the negligence charged and the burden is not met if resort must be made to speculation, Biddlecom v. Nelson Grain Co., Mo., 178 S.W. 750, 756[5]; and the test on causal connection is whether the facts show that absent the charged negligence the injury would not have been sustained. Housden v. E. I. Du Pont De Nemours & Co., Mo., 321 S.W.2d 430, 433[3]; Wood v. St. Louis Public Service Co., 362 Mo. 1103, 246 S.W.2d 807, 811[4]; Taylor v. Hitt, supra. We have demonstrated that the medical testimony, standing alone and at its most, is that delay could have caused the patient's shock and dehydration and that the doctor would like to think he could have saved her had he seen her sooner. This was not substantial evidence of causation, and the lay testimony adds nothing substantial to assist plaintiff on the issue of negligence charged, i. e., delay in securing medical assistance from the onset of defendants' knowledge. There is a wealth of evidence to the effect that Mrs. James was sick after eating a ham and cheese sandwich and potato salad, and that sometime around 9:30 became very ill, but there is no substantial evidence that any delay of defendants caused the dehydration and shock and ultimate death. Dr. Holt, when permitted to consider all the circumstances, could not so say without guessing, and the lay testimony does not supply the missing proof.

Appellant has cited Ketcham v. Thomas, supra, and Walker v. St. Louis Public Service Co., supra, which have been previously distinguished from the situation here. In addition, he cites York v. Daniels, 241 Mo. App. 809, 259 S.W.2d 109, which is not in point because both obvious causation and medical testimony were present. There, a lady without illness or injury was physically manipulated by a chiropractor and suffered immediate pain, convulsions, and illness. In addition, there was medical testimony that the jerk of deceased's head and neck could have caused the rupture of her spinal cord and her consequent death. In Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S.W.2d 125, plaintiff had substantial medical evidence on the cause of injury, and it was simply disputed by defendant's medical experts. And in Lewkowitz v. United Railways Co. of St. Louis, 178 Mo. App. 629, 161 S.W. 588, the doctor described the patient's symptoms and his opinion was that the patient suffered from nephritis resulting from a damaged kidney. Such was substantial evidence even though, upon cross-examination, he admitted that an operation to expose the kidney would be needed in order to be absolutely positive.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., and HENLEY and DONNELLY, JJ., concur.

HYDE, J., not participating.