**Jean M. STOCK, Michelle Marie Stock and Karen Jean Stock, Appellants,**

**v.**

**Dr. Deo K. BHATI, Respondent.**

**No. 15770.**

Missouri Court of Appeals,
Southern District,
Division One.

June 28, 1989.

David L. Steelman, Mark Roberts, Salem, for appellants.

Dan L. Birdsong, Thomas, Birdsong, Clayton & Haslag, P.C., Rolla, for respondent.

CROW, Presiding Judge.

Plaintiffs Jean M. Stock (widow of Feriald Stock), and Michelle Marie Stock and Karen Jean Stock (daughters of Jean and Feriald Stock), brought an action under § 537.080, RSMo Cum.Supp.1984, against defendant Deo K. Bhati, a medical doctor, alleging that Mr. Stock died June 1, 1981,

as the result of negligent medical care by defendant. Trial by jury produced a judgment for defendant.

Plaintiffs appeal, briefing two points. Plaintiffs concede their assignments of error are before us for plain error review only, as their motion for new trial was late.[1] Under Rule 84.13(c), Missouri Rules of Civil Procedure (20th ed. 1989), plain errors affecting substantial rights may be considered on appeal in the discretion of the court, though not preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.

Ferial Stock died in a Salem hospital to which he had been admitted some 16 hours earlier by defendant. On the death certificate defendant listed the immediate cause of death as cardiac arrest due to or as a consequence of pulmonary embolism due to or as a consequence of deep vein thrombosis.

Charles P. McGinty, a medical doctor testifying for plaintiffs, explained, "[T]hrombosis means a clotting [of blood], and deep refers to the deep veins in the legs or lower extremities rather than the superficial veins." He added: "A pulmonary embolus is a situation in which a fragment ... breaks off from a blood clot in one of the deep veins of the lower extremity and flows upward through the vena cava[,] ... the large vein that leads from the lower part of the body into the heart. The clot goes right through the heart without any problem, but it's filtered out in what we call a pulmonary artery." When that occurs, said McGinty, there are "severe reflex changes" which can lead to death. McGinty testified he had reviewed the death certificate together with certain medical records pertaining to Ferial Stock and other pertinent data, and that he (McGinty) agreed with defendant that the cause of death was cardiac arrest due to pulmonary embolism. McGinty also agreed with defendant's diagnosis of deep vein thrombosis, and declared on cross-examination that while no autopsy was performed to confirm such diagnosis, "[w]e really don't need one in this case."

McGinty opined that defendant's treatment of Ferial Stock was, in certain particulars, below the degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession, and that had certain treatment specified by McGinty been administered, Mr. Stock would not have died.

Laurence Dry, another medical doctor testifying for plaintiffs, also agreed with defendant's diagnosis of deep vein thrombosis. Dry testified that defendant, in his treatment of Mr. Stock, failed in sundry respects to exercise the degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession. Dry expressed the opinion "within a reasonable degree of medical certainty" that Mr. Stock would have lived had he been treated appropriately.

Defendant presented—by deposition—the testimony of W. Kirt Nichols, a medical doctor. Over plaintiffs' objection Nichols testified:

"Q Have you been able to reach an opinion as to what caused Ferial Stock's death?

A I have some opinions about possibilities. Unfortunately, as I went through the records, I found that there was no autopsy, and therefore, the final proof that we use in medical circles to define what exactly happened, we don't have. So anything I say is speculative and must be viewed in that light.

My own personal opinion is that he perhaps had a ruptured abdominal area aneurysm. He also could have had a pulmonary embolism. He also could have had a myocardial infarction. He could have died of cardiac arrhythmia, or he could have died of severe congestive failure with pulmonary edema.

I think any of those factors are distinct possibilities."

---

1. Affidavits filed on plaintiffs' behalf show the motion was mailed in time to have reached the trial court by the deadline had the mail been delivered on normal schedule, but for unknown reasons it was not.

The above dialogue is one of three segments of Nichols' testimony about which plaintiffs complain in their first point. The second passage attacked in plaintiffs' first point came during Nichols' redirect examination, where he testified:

"Q Dr. Nichols, can you tell based upon a reasonable degree of medical certainty [without] an autopsy having been presented to you as part of the medical records what the cause of death of Mr. Stock was?

A No, I cannot.

Q So we don't know the mechanism of his death?

A No, it's all conjectural.

Q So when you say you think it was abdominal aneurysm, that's conjecture, you're admitting?

A That's correct. That's my gut reaction, my hunch."

In plaintiffs' brief they assert the above excerpt was allowed in evidence over their objection; however, we find no objection in the transcript. Plaintiffs did register an objection to the third segment of Nichols' testimony about which they complain in their first point. That testimony, which also came during Nichols' redirect examination, was:

"Q ... you have not seen [Dr. McGinty's] deposition, but he said he would have used a filter as a prophylactic measure; therefore, you would not have done what he suggested having done either, would you?

A That's correct, I would not."

■ Plaintiffs' objection at trial to the first and third segments of Nichols' testimony was that there was an insufficient foundation for it and that such testimony was too speculative. Plaintiffs' first point on appeal reads:

"The trial court erred in admitting into evidence portions of the deposition of Dr. Kirt Nichols for the reason that those portions of the deposition did not state an opinion but were conjecture and speculation, and the testimony was introduced and used to confuse the jury instead of to assist the jury."

Plaintiffs direct us to *Summers v. Tavern Rock Sand Co.*, 315 S.W.2d 201, 205–06[7] (Mo.1958), which explains that expert testimony is of assistance to a jury inasmuch as experts possess knowledge which jurors cannot have acquired in their common experience. An expert necessarily states his conclusions about certain matters, which is proper so long as his opinion is not a mere guess or conjecture, but is based on facts and adequate data. *Id.* Plaintiffs maintain that Nichols' testimony as to the cause of Mr. Stock's death was, by Nichols' own admission, based on nothing more than speculation. Consequently, say plaintiffs, Nichols' testimony was offered by defendant to confuse rather than to assist the jury.

Plaintiffs maintain the question of what caused Mr. Stock's death was a key element in the suit, therefore Nichols' "gut reaction" that one possible cause for Mr. Stock's death was a ruptured abdominal area aneurysm was extremely prejudicial, and that the prejudice was exacerbated when defendant's lawyer argued to the jury that Nichols said, "[T]here's no way for anyone to determine what this man died of."

*Galovich v. Hertz Corp.*, 513 S.W.2d 325 (Mo.1974), cited by plaintiffs, quotes the following language from *Armstrong v. Croy*, 176 S.W.2d 852, 853–54[1–3] (Mo. App.1944):

"When a witness testifies, 'If I am not mistaken', 'probably', 'very likely' or 'possibly'; that he 'believes' or 'thinks' so and so to be the case, his testimony is objectionable and should be rejected. It is of no probative force or evidential value and definitely so if the witness is not testifying as an expert; and upon appeal such testimony should be considered, if at all, with great caution, although received without objection in the trial court. Even when such expressions or words are used by a witness qualified to express an opinion his testimony will be rejected unless it sufficiently appears that such terms are used to express his opinion or judgment." *Galovich*, 513 S.W.2d at 335[10].

In *Galovich* a driver contended that after a motor vehicle accident he began developing a seizure condition involving blackouts. His medical witness testified that, in his opinion, the accident either caused the seizures or severely aggravated a preexisting condition. The driver had experienced dizzy spells before the accident and had been involved in other accidents before and after the subject accident. One of the defendants presented testimony by a neurologist and psychiatrist who was asked which accidents he blamed on the blackouts. The doctor responded that he was suspicious regarding the accident in question. Appealing from an adverse judgment the driver maintained that the doctor's answer was speculative and invaded the province of the jury. Rejecting the contention, the Supreme Court said:

"The line of questioning ... sought the witness's opinion as a neurologist and psychiatrist as to which of [the driver's] accidents related to the blackouts. In using the expression that he was 'suspicious,' the witness, as demonstrated by his answer to the subsequent question, was expressing his opinion, based upon his knowledge as a physician, on the question propounded. In such circumstances, the fact that he expressed his conclusion in terms of a 'suspicion' does not render the answer inadmissible." 513 S.W.2d at 335.

In *Armstrong*, from which *Galovich* quoted the passage set forth earlier, the dispute was over an account; the creditor, in testifying about the sums due, used the vague terms noted in the opinion. *Armstrong* did not involve expert testimony.

*James v. Sunshine Biscuits, Inc.*, 402 S.W.2d 364 (Mo.1966), also cited by plaintiffs, arose from the death of an employee who became ill at work after eating during a break and died some 12 hours later. Suit was brought against the employer on the theory that death resulted from delay in providing medical care. Upholding a judgment for the employer, the Supreme Court said:

"In this case it is apparent ... that [the suing party] failed to produce substantial medical evidence that delayed medical care caused or contributed to cause the death. [The attending physician] and the autopsy were unable to make a final diagnosis of cause of death and no anatomical cause was shown. [The physician] had only an impression, which he admitted would not reach the dignity of an opinion, that the deceased had acute food poisoning." *Id.* at 373. The opinion went on to emphasize that only by indulging in guesswork and speculation could the physician have an opinion that failure to receive medical care for some two hours after the onset of illness contributed to the shock and dehydration from which the employee never recovered. *Id.*

Plaintiffs in the instant case recognize that the question in *James* was one of *submissibility* of the suing party's case, while in the instant case the question is one of *admissibility* of the challenged testimony. Plaintiffs nonetheless argue that defendant's burden as to admissibility should be no different than the suing party's burden as to submissibility in *James*.

Defendant responds that the cases relied on by plaintiffs are inapposite in that plaintiffs had the burden of proving defendant's negligence caused Mr. Stock's death, whereas defendant had no obligation to prove that death resulted from any particular medical condition. Defendant insists that once Dr. McGinty testified that the cause of death was cardiac arrest due to pulmonary embolism, defendant had the right to rebut such testimony with evidence that pulmonary embolism was only one of five possible causes of death and that absent an autopsy the true cause of death could not be ascertained.

The closest case we find is *Miller v. Engle*, 724 S.W.2d 637 (Mo.App.1986). There a passenger in an automobile sued the driver for injuries allegedly sustained in an accident caused by the driver's negligence. The passenger won at trial but appealed, claiming the recovery was inadequate. One of the passenger's alleged injuries was a persistent and disabling headache. He denied suffering such headaches prior to the accident, and his medical expert

**494**

attributed the headaches to the accident. The driver introduced in evidence medical records showing that the passenger had complaints about headaches as a child, that he had suffered a concussion in a fall, that he had been hospitalized complaining of headaches and fainting spells, that he had been in another automobile accident after which he complained of headaches, and that he received medical attention for a football injury which caused a loss of memory. The passenger argued on appeal that the records were used as a basis for the driver's lawyer to argue that the cause of the passenger's headaches was one or more of his previous injuries and not the subject accident. Such an opinion, maintained the passenger, can be expressed only by an expert medical witness. The Western District of this Court said:

"[T]here is no indication that the medical records were offered to prove any statement of expert opinion on the cause of [the passenger's] headaches. The records do establish that [he] had voiced repeated complaints about headaches for many years and that he had previously received treatment for various head injuries. [The driver] had no burden to prove the cause of [the passenger's] headaches and therefore it is of no avail to [the passenger] if the records were not competent proof of causation. The records were appropriate evidence for the jury to consider in deciding whether to believe [the passenger's] testimony about the onset of his headaches and to evaluate the testimony of [his] medical expert who was not given the history of previous accidents and complaints reflected in the records. *Id.* at 640–41[6].

In the instant case plaintiffs' theory of liability was that Mr. Stock entered the hospital suffering from deep vein thrombosis, that in treating such condition defendant failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession, and that as a result of defendant's negligence Mr. Stock underwent cardiac arrest due to a pulmonary embolism which caused his death. Dr. Nichols expressed the opinion that the cause of death

could not be determined from the medical records, that the cause of death could have been determined only by an autopsy, and that the records indicated death could have resulted from five different causes, one of which was a pulmonary embolism. While Nichols said his "personal opinion" was that perhaps Mr. Stock had a ruptured abdominal area aneurysm, Nichols made it indubitably clear that this was only his "gut reaction" or "hunch," and that naming any one of the five possible causes of death as the actual cause of death would be conjectural.

We noted earlier that while plaintiffs' first point complains of the three passages from Nichols' testimony heretofore quoted, plaintiffs objected at trial to only the first and third passages, and that due to their untimely motion for new trial even those objections are before us for plain error review only.

■ Inasmuch as plaintiffs failed to object at trial to the second passage from Nichols' testimony, the question of admissibility of that testimony was never presented to the trial court. It is well established that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach,* 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed,* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983); *School District of Kansas City v. Smith,* 342 Mo. 21, 111 S.W.2d 167, 168 (1937). We therefore would be justified in declining to consider, even as plain error, plaintiffs' complaint about the second segment of Nichols' testimony. However, as we are considering the first and third segments we shall consider the second one also.

As to the first and second segments it is arguable that they were admissible on the basis advanced by defendant, i.e., to rebut plaintiffs' evidence that the cause of Mr. Stock's death was cardiac arrest due to a pulmonary embolism, by showing that this was only one of five possible causes of death and that absent an autopsy the cause of death could not be determined. We

need not, however, decide whether the testimony was admissible on that theory, but only whether its admission caused manifest injustice or a miscarriage of justice.

■ Contrary to plaintiffs' assertion we do not understand Nichols as saying in the first and second segments of his testimony that his opinion regarding the cause of Mr. Stock's death is based on speculation. We believe he is saying that from the available data he cannot determine to a reasonable degree of medical certainty what caused Mr. Stock's death, that the existing information indicates death could have resulted from any one of five different causes, that the actual cause of death could have been ascertained only by an autopsy, and that without an autopsy any proclamation that Mr. Stock died from one particular cause would be speculative. So viewed, all Nichols' testimony did was show the jury there was a medical expert who did not embrace plaintiffs' theory that there was adequate data from which to conclude that Mr. Stock died from cardiac arrest due to pulmonary embolism resulting from deep vein thrombosis. As Nichols made it unmistakably clear that he was not maintaining to a reasonable degree of medical certainty that Mr. Stock died of a ruptured abdominal area aneurysm, but only that such condition was one of five separate and distinct possible causes of death, we hold that the admission of such testimony did not result in manifest injustice or a miscarriage of justice.

As to plaintiffs' complaint about the third segment of Nichols' testimony, we noted earlier that their objection at trial was that there was an insufficient foundation for it and that it was too speculative. As we understand the argument following the first point in plaintiffs' brief, their complaint now is that such testimony "was offered for no other purpose than to confuse the jury," as the testimony "had nothing to do with whether or not certain treatment was negligent but rather was a simple statement that [Nichols'] treatment of a patient might have been different than another doctor's."

■ A party may not advance on appeal an objection to evidence different from the one presented to the trial court. *Frank v. Environmental Sanitation Management, Inc.,* 687 S.W.2d 876, 884[17] (Mo. banc 1985). Consequently, even had plaintiffs' motion for new trial been timely filed the complaint now voiced would not have been preserved, and would be here for plain error review only.

■ We find nothing wrong in the admission in evidence of the third segment of Nichols' testimony. Dr. McGinty, under questioning by plaintiffs' lawyer, stated that one method of treating Mr. Stock would have been by the surgical insertion of a filter. McGinty testified that had any one of the methods of treatment described by him been properly employed, he believed within a reasonable degree of medical certainty that Mr. Stock would have survived. As plaintiffs' theory of liability was that defendant failed to properly treat Mr. Stock, and as one of the methods of treatment that could have been utilized, according to plaintiffs' expert McGinty, was the insertion of a filter which McGinty believed to a reasonable degree of medical certainty would have saved Mr. Stock's life, defendant was entitled to present expert testimony that such treatment should not have been administered. A party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. *Massman v. Muehlebach,* 231 Mo. App. 72, 95 S.W.2d 808, 813 (1936); 98 C.J.S. *Witnesses* § 629 (1957). As Nichols' qualifications as an expert in the field of medicine involved in the instant case were unquestioned, the receipt in evidence of the third segment of his testimony did not constitute error, plain or otherwise. Plaintiffs' first point is denied.

Their second point is:

"The trial court erred in that it demonstrated hostility towards an expert witness called on behalf of [plaintiffs] and displayed prejudice against [plaintiffs] and bias in favor of [defendant]."

**496**

In support of the point plaintiffs direct us to four instances during the testimony of Dr. Dry where the trial court rebuked Dry about his answers. One of the instances was at the request of defendant's lawyer; the other three were uninvited. Plaintiffs also direct us to two instances where the trial court interrupted during their lawyer's cross-examination of defendant, and one instance where the trial court refused a request by their lawyer to instruct defendant to answer a question. On that occasion the trial court remarked, "I'm not sure anyone could answer the question the way it is propounded." Plaintiffs cite *Harms v. Simkin*, 322 S.W.2d 930, 938[9–11] (Mo.App.1959), where the duty of a trial judge to maintain strict impartiality as between the adverse parties is eloquently discussed. Plaintiffs maintain that the conduct of the trial judge unquestionably prejudiced the jury against them.

We have carefully read the 402–page transcript of the two-day trial and have closely studied the episodes about which plaintiffs complain. We have also noted (1) an instance where the trial court indicated its willingness to allow plaintiffs' exhibits to be displayed from the bench so the jury could see them better, (2) an instance where the trial court asked a juror whether he could hear one of plaintiffs' witnesses and asked the witness to speak up, (3) an episode during the cross-examination of defendant by plaintiffs' lawyer where the trial court admonished defendant that "the lawyer will ask the questions and you give the answers, please, sir," and (4) an occasion when defendant's lawyer began reading from a deposition and the trial court directed him to tell plaintiffs' lawyer which deposition it was. Had plaintiffs won the case these four episodes might have supplied the basis for a contention by defendant that the trial court manifested favoritism toward plaintiffs and their lawyer, and prejudice against defendant.

While the trial court perhaps should not have injected itself into the trial to the extent it did, we do not find in the whole record any demonstrable bias by the trial court against plaintiffs, their witnesses, or their lawyer, or any favoritism by the trial court toward defendant or his lawyer. We are likewise certain that the trial court's deportment left no impression with the jury that the trial court favored either side. It follows that the conduct of the trial court, in the respects complained of by plaintiffs, did not result in manifest injustice or a miscarriage of justice.

Plaintiffs' second point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.